IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs August 21, 2019

## UGENIO DEJESUS RUBY-RUIZ v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Davidson County**
**No.  2011-C-2109      Steve Dozier, Judge**

### No. M2019-00062-CCA-R3-PC

The Petitioner, Ugenio Dejesus Ruby-Ruiz, appeals the Davidson County Criminal Court's denial of his petition for post-conviction relief from his 2013 convictions for nine counts of rape of a child, two counts of rape, five counts of aggravated sexual battery, and three counts of sexual exploitation of a minor and his 121-year sentence at 100% service.  The Petitioner contends that he received the ineffective assistance of appellate counsel.  We reverse the judgment of the post-conviction court and remand the case for the entry of an order granting the Petitioner a delayed appeal for the limited purpose of filing an application for permission to appeal to our supreme court.  The Petitioner's remaining allegations shall be held in abeyance in the post-conviction court until the resolution of the delayed appeal.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Reversed;
Case Remanded**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., J., joined.  JOHN EVERETT WILLIAMS, P.J., filed a dissenting opinion.

Manuel B. Russ, Nashville, Tennessee, for the appellant, Ugenio Dejesus Ruby-Ruiz.

Herbert H. Slatery III, Attorney General and Reporter; Sophia S. Lee, Senior Assistant Attorney General; Glenn Funk, District Attorney General; and Tammy Meade, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

This case relates to sexual offenses perpetrated against A.M., the Petitioner's stepdaughter who was between the ages of eight and thirteen when the abuse occurred, and the stepdaughter's friend, A.T.  The Petitioner appealed his convictions.  This court affirmed the convictions and summarized the facts of the case as follows:

We will refer to the minor victim in this case by her initials, A.M. She testified that she was 15 years old at the time of trial. Defendant was her stepfather, and she called him "dad." She lived with her mother, her siblings, and Defendant. A.M. testified that Defendant began sexually abusing her when she was eight or nine years old.

A.M. testified that on one occasion, she walked in on Defendant watching pornography on television. She saw Defendant sitting on the couch, and he was masturbating. She testified that Defendant told her to watch it with him, but she went to her bedroom instead. Defendant followed her. She testified that Defendant touched her "private parts" over her clothing. A.M. recalled another incident when she and Defendant were in Defendant's bedroom. She testified, "I guess he just felt like doing it. And like – I guess he just felt like having sex so he told me if I wanted to. And I guess I just didn't want to argue so I just let him." She agreed to have sex with Defendant and unclothed herself. She testified that Defendant penetrated her anally. A.M. specifically remembered the occasion because her mother came home from the grocery store during the incident, and she quickly dressed herself. She testified that Defendant had previously had anal sex with her. She testified that the first time it hurt, and Defendant told her that it would not hurt the next time.

A.M. recalled another incident in the living room when Defendant was watching pornography. She saw "half-naked" girls dressed as clowns touching each other's private parts. She testified that she sat on the couch beside Defendant, and Defendant began touching her private parts over her clothing. She testified that Defendant was touching his penis, and he asked her to touch his penis. Defendant then ejaculated. A.M. testified that Defendant wiped semen off his penis with a paper towel. She testified that Defendant had wiped "sperm" off his penis with a paper towel on several other occasions.

A.M. testified that Defendant also touched her private parts on several occasions in her bedroom, but she did not recall any specific incidents. A.M. recalled that Defendant touched her private parts over her clothing and under her clothing. Defendant would sometimes put his hand under her clothes.

A.M. testified that on occasions when she "would deny him" sex, Defendant would put his penis in her mouth. Defendant also put his mouth on her breasts. A.M. testified that when her family moved to "the yellow house," Defendant was having sexual encounters with her "two times a week." A.M. recalled the first time Defendant tried to have vaginal intercourse with her.

-2-

She testified that she and Defendant were the only people in the house. A.M. was laying on Defendant's bed. Defendant told her to take her clothes off because "he wanted to stick it in [her] vagina." She told Defendant that it hurt, and Defendant told her that it would only hurt the first time. A.M. testified that she cried. She testified that her mother arrived home, and A.M. ran to the bathroom because she was bleeding. She testified that her mother believed A.M.'s menstrual cycle had started because she was bleeding.

A.M. recalled another occasion Defendant penetrated her vaginally. She testified that she was watching television in Defendant's bedroom while she waited for her mom to return home from work. Defendant told her that he wanted "to do it again[,]" and A.M. refused because her mother would be home soon. A.M. testified, "he told me it was going to be quick. So I just got tired of saying no because I know he wouldn't understand." A.M. removed her clothes and spread her legs open. Defendant tried to put his penis in her vagina, and A.M. told him to stop because it hurt. She testified, "I told him, no, because it did hurt and he did it anyways. I guess he didn't care." She believed that she was in the fifth or sixth grade at that time.

A.M. testified about one incident when they were in the living room. Defendant was sitting on the couch, and A.M. was kneeling on the floor. Defendant put his penis in her mouth and then ejaculated onto a piece of paper. A.M. recalled another incident when she was taking a shower, and Defendant got in the shower with her and "showed [her] his penis." Defendant touched A.M.'s private parts and told her to put her mouth on his penis. Defendant told A.M. that he would give her money if she put her mouth on his penis. A.M. testified that the incident ended when she heard her brother in the house.

A.M. testified that "most often" the sexual encounters would happen in Defendant's bedroom. She testified that it happened "a lot." She recalled another incident when she was in fifth grade, and her friend A.T. was visiting. They were wearing their bathing suits in the bathtub, and Defendant came into the bathroom and exposed his penis to them. A.T. left the bathroom, and Defendant then put his penis in A.M.'s mouth. A.M. testified that on two other occasions when A.T. was visiting, Defendant called them over to watch pornography with him. A.M. testified that she asked A.T. not to tell anyone about the incidents.

A.M. recalled an incident when Defendant's niece was visiting. Defendant gave his niece money to leave the room, and Defendant then told

A.M. to put her mouth on his penis. A.M. testified that Defendant was sitting on the couch, and A.M. was kneeling on the floor. She also recalled an occasion when her mother went to a party, and A.M. "thought the same thing's going to happen that always happens when nobody's around. . . . Have sex with [Defendant]." A.M. testified that Defendant was mostly having vaginal intercourse with her by that time.

A.M. testified that when she was thirteen years old, her youngest sibling was born. A.M. recalled an occasion when she went into Defendant's bedroom to give the baby a bottle, and Defendant told her to give the baby to another sibling. Defendant then told A.M. that he wanted to have sex, and A.M. took her clothes off and laid on Defendant's bed. She testified, "I couldn't say anything because I would be mad because I would get so tired of it. And so I would just let him do it, what he needed to do." She testified that Defendant penetrated her vaginally, and the encounter ended when her sister knocked on the bedroom door. A.M. also recalled an incident just before her youngest sibling was born when Defendant put his penis into her mouth while they were in the living room. She testified that her sister watched the incident.

A.M. testified that Defendant told her that she "shouldn't tell because he would go to jail and what would happen to [A.M.'s] little brothers." Defendant also told A.M. that she was prettier than her mother and that he had sex with A.M. because A.M.'s mother would not have sex with him. Defendant told A.M. that he loved her and he wanted to marry her. Defendant used his cell phone to take photographs of A.M.'s naked body. He also showed A.M. a photograph of her mother's naked body on his phone and told A.M. that her breasts looked better than her mother's breasts. A.M. testified that Defendant also used his phone to take video of her performing oral sex on him, but he did not show the video to A.M. A.M. also testified that Defendant gave her money, a camera, and allowed her to go places in exchange for sexual acts.

In February 2011, A.M. began running away from home. She recalled an incident on a Sunday in March 2011. She was in the eighth grade. After having sex with Defendant, A.M. left the house to go stay with her boyfriend, F.R., with whom she testified she had a consensual sexual relationship. While she was staying with F.R., she told him that Defendant was sexually abusing her. She stayed at F.R.'s house for approximately one week.

The police came to F.R.'s house. A.M. was hiding in a closet when the police arrived. F.R. encouraged A.M. to tell the police about the sexual abuse. A.M. testified that she was afraid of how her mother would react. She testified

that she initially lied to the police about having had sex with Defendant because she was embarrassed. She also did not tell police that she had sex with F.R. She testified that she did not tell police that she took her clothes off when Defendant asked to have sex with her because she did not want them to think that the sexual abuse was her fault. She testified that she "got tired . . . [o]f [Defendant] always wanting to do it and taking off [her] clothes[,]" so she took her clothes off instead.

We will refer to one of A.M.'s friends who testified by her initials also. A.T. testified that she became friends with A.M. in fifth grade. She testified that the first time she went to A.M.'s house, she saw Defendant watching pornography in the living room. She testified that Defendant "just looked [at A.T. and A.M.] and smiled casually." She testified that she saw two people having sex on television. A.T. also testified that on another occasion, she and A.M. were in the bathtub, and they were wearing bathing suits. Defendant got into the bathtub with them. Defendant was wearing underwear. Defendant asked A.M. in Spanish to give him oral sex, and he removed his underwear. A.T. left the bathroom. A.M. told A.T. not to tell anyone about the incident because her mother would not believe her and Defendant would go to jail. On another occasion, Defendant called A.T. and A.M. into his bedroom. Defendant was watching pornography and masturbating under the covers. Defendant asked A.M. to sit with him on the bed, and she agreed. A.T. stopped visiting A.M.'s residence when she was in the sixth grade because her family moved, and she changed schools. She also testified that her mother was not comfortable with Defendant watching her.

F.R. testified that he and A.M. began dating when A.M. was 13 years old. F.R. was 16 years old. He testified that in March 2011, he and A.M. were driving to a friend's house. A.M. was being unusually quiet. F.R. asked A.M. if Defendant had sexually abused her, and A.M. answered affirmatively. A.M. asked F.R. not to tell anyone because she was afraid "her family [wa]s going to fall apart." A.M. stayed at F.R.'s house the following week until police came to his house looking for A.M. F.R. admitted that he had been adjudicated delinquent for theft and aggravated burglary.

Detective Jeff Gibson testified that A.M.'s mother reported her as a runaway in March 2011. Detective Gibson located A.M. at F.R.'s father's house. He found A.M. hiding in a closet. She was crying and "very passionate about not wanting to go home." A.M. disclosed sexual abuse to another officer, and Detective Mayo contacted the sex crimes division. Detective

-5-

Jason Mayo was assigned to investigate the allegations in this case. Detective Mayo interviewed A.M. Based on his interview of A.M., he arranged for a forensic interview at the Child Advocacy Center. Detective Mayo contacted A.M.'s mother. A.M.'s mother and Defendant arrived at the police station. Detective Mayo then interviewed Defendant. Defendant initially denied that he had touched A.M. or had sex with A.M. Defendant then told Detective Mayo that he had sex with A.M. one time but that A.M. had initiated it. Detective Mayo requested that another officer search Defendant's cell phone. Detective Chad Gish searched Defendant's phone for photos of A.M. and her mother. Detective Gish found a photo of a woman's breasts on Defendant's phone, but he did not find any nude photos of A.M.

Reda Williams, a home healthcare provider, testified that she provided care for Defendant's special needs son. She began working with the family in 2010, and she worked with the family for approximately one year. She testified that she was at the residence four or five days per week from approximately 3:00 p.m. until 9:00 or 11:00 p.m. and on the weekends as needed. Ms. Williams testified that she never saw Defendant watching pornography or behaving inappropriately.

*State v. Ugenio Ruby-Ruiz*, No. M2013-01999-CCA-R3-CD, 2015 WL 2227933, at *1-4 (Tenn. Crim. App. May 12, 2015), *perm. app. denied* (Tenn. Mar. 23, 2016).

On June 27, 2016, the Petitioner filed the instant petition for post-conviction relief, alleging that trial counsel provided ineffective assistance. The Petitioner likewise filed a motion to late-file the petition because more than one year had passed since our supreme court dismissed the Petitioner's untimely application for permission to appeal. On June 30, 2016, the post-conviction court determined that the one-year statute of limitations had expired, but the court appointed counsel, permitted counsel to file an amended petition, and scheduled a hearing to determine whether "due process concerns" required tolling the statute of limitations. However, on July 13, 2016, the post-conviction court entered an amended order stating that the petition had been timely filed and scheduled an evidentiary hearing to consider the merits of the Petitioner's ineffective assistance allegations. After the February 2017 evidentiary hearing, the post-conviction court denied relief. On appeal, though, this court determined that the petition for relief had been untimely filed and, as a result, vacated the denial of post-conviction relief and remanded the case to the post-conviction court for the purpose of determining whether due process required tolling the statute of limitations. *See Ugenio Dejesus Ruby-Ruiz v. State*, No. M2017-00834-CCA-R3-PC, 2018 WL 1614054, at *3 (Tenn. Crim. App. Apr. 3, 2018), *no perm. app filed*. The post-conviction court determined that due process required tolling the statute of limitations period and again denied relief, relying upon its original order.

## Post-Conviction Hearing

At the February 3, 2017 post-conviction hearing, trial counsel testified that she began representing the Petitioner in July 2012, about six months before the January 2013 trial. She said that the Petitioner spoke Spanish, that she spoke Spanish well, that sometimes she met with the Petitioner alone, and that sometimes she and a Spanish-speaking investigator met with the Petitioner. She did not suspect a communication problem between her and the Petitioner. Counsel estimated meeting with the Petitioner ten to fifteen times before the trial. Counsel said that the previous attorney who represented the Petitioner had filed a motion for discovery, that the State had responded to the motion, and that she did not recall providing the discovery materials to the Petitioner. She said that, in similar cases, she advised a client not to keep discovery materials at the jail because the subject matter created a risk to the client's safety. She said, though, that she and the Petitioner reviewed the discovery materials.

Trial counsel testified that she reviewed the video recordings of the forensic interviews and that although she did not recall viewing the recordings with the Petitioner, she would have told the Petitioner about A.M.'s and A.T's statements. Counsel said that the Petitioner participated in his defense, asked questions, and provided his thoughts on how to proceed. She recalled that the Petitioner suggested contacting the nurse who testified for the defense at the trial and a teacher to whom A.M. was alleged to have recanted. Counsel said that although the Petitioner did not know the teacher's name, the Petitioner directed counsel to speak with the Petitioner's former wife. Counsel said that she spoke to the former wife on the telephone and that counsel determined the former wife would not have been a useful witness. Counsel thought that she and the Petitioner discussed her determination, although she did not recall specifically. Counsel said the former wife believed that A.M. lied about "small things" but not about "big things," could not recall the names of A.M.'s teachers, and had not seen inappropriate behavior between the Petitioner and A.M.

Trial counsel testified that the Petitioner doubted the credibility of the witnesses. Although she did not recall discussing her trial strategy with the Petitioner, she said they discussed whether he would testify, engaged in mock questioning, and came to a "joint decision" that his testifying would have been a "bad idea." Counsel agreed the defense was that the allegations were fabricated. She thought that the Petitioner mentioned a neighbor who could have been a defense witness but that she was unsure. She did not recall talking to a neighbor. She said that the State extended a plea offer of twenty years at 85% and that the defense presented a counteroffer of ten years at 30%. She did not recall whether the State offered twelve years at 30%, but she did not dispute an offer was made if her file reflected it. She recalled that the Petitioner rejected the twenty-year offer and said that if the Petitioner had expressed interest in accepting an offer that had been withdrawn, she would have attempted to convince the prosecutor to allow the Petitioner to accept it.

Trial counsel testified that the Petitioner spoke to the Petitioner's former wife during his incarceration and that the communication ended after the former wife moved to Georgia. Counsel did not recall a jail telephone call among the Petitioner, the former wife, and A.M. in which A.M. recanted her allegations. Counsel did not recall a discussion during which the Petitioner told counsel that his former wife and A.M. were going to sign an affidavit reflecting A.M.'s recantation. Counsel did not recall DNA evidence implicating the Petitioner, although the police attempted to "bluff" him during the interview. Counsel did not consider filing a motion to sever any particular count in the indictment.

On cross-examination, trial counsel testified that she would have filed a motion to sever a particular indictment count if she had determined severance was warranted. She said that a severance hearing was held relative to the offenses involving the two victims.

The Petitioner testified that he and trial counsel communicated in Spanish. He agreed counsel discussed with him the State's evidence, his constitutional rights, what would occur at the trial, and whether he would testify at the trial. He said that counsel came to the jail to meet with him but that he met with counsel mostly at the courthouse.

The Petitioner testified that he rejected the State's plea offer because he was innocent and because the proof against him was weak. He said that the last offer extended by the State was twelve years at 85% service. When the post-conviction court asked why he did not accept this offer, the Petitioner said that when trial counsel informed the prosecutor of the Petitioner's desire to accept the offer, the prosecutor stated that the offer had been withdrawn because the prosecutor was prepared for the trial. The Petitioner said counsel anticipated that he would be convicted at the trial and that the trial court would impose a lengthy sentence. He said that after this conversation, he wanted to accept the twelve-year offer that had been withdrawn by this time, which he said was about one year before the trial.

The Petitioner testified that he was not provided any documents to review from the discovery materials and noted that he did not speak or read English. He denied trial counsel read the materials to him but said that counsel reviewed each charge contained in the indictment and the "exposure of each one of those charges." He said that counsel reviewed the victims' allegations and told him that the evidence was strong. He said that counsel always changed the subject when he questioned the victims' statements. He said that he did not know a victim's testimony was sufficient evidence for a conviction and that he thought a conviction required three or four witnesses. He did not recall reviewing information from the Department of Children's Services (DCS) but said he told counsel about A.M.'s previous involvement with DCS beginning at age twelve. The Petitioner recalled that A.M. ran away from home to spend time with her friends and was "aggressive with her mother." He said that he told counsel about these incidents but that counsel did not obtain the DCS records.

He believed the records would have benefited his defense because DCS questioned A.M. extensively about the cause of her behavior and that she never mentioned any sexual abuse.

The Petitioner testified that trial counsel discussed the trial process and whether he should testify. He said that counsel advised against his testifying, although he wanted to testify. He said that although counsel testified that they both agreed he should not testify, he told counsel that she would decide what was best for him. He said counsel did not tell him that he did not have to follow her advice about his testifying. He said that he wanted counsel to call "witnesses and talk to certain people," including "the nurse" and "the neighbor," but that counsel did not attempt to contact them until three days before the trial. He agreed the nurse testified at the trial.

The Petitioner testified that he did not understand the charges involved two victims. He said that he and trial counsel discussed severing charges related to A.M. but that counsel said it would have taken a very long time to try each count separately. He said that he communicated with his former wife during his pretrial confinement and that she reported A.M. was a "rebel," who ran away from home and denied telling a teacher she lied about the allegations to help her boyfriend. The Petitioner said he was arrested in 2011 and that his and his former wife's conversations occurred in 2011, a few months into his pretrial incarceration. He said that he told counsel about the conversations and that he might have told a previous attorney about them. The Petitioner said that he "insisted" counsel present his former wife as a defense witness but that counsel did not. He recalled counsel's excuses for not presenting his former wife at the trial, which included the cost of traveling from out of state and his former wife's failure to answer the telephone when counsel called. He disagreed with counsel that his former wife would have been an unfavorable defense witness because she knew he was innocent.

The Petitioner testified that he retained appellate counsel, that they never met personally, and that counsel wrote him a letter after he complained to the Board of Professional Responsibility. The Petitioner recalled that counsel's letter came about one year after counsel was retained. The Petitioner said that he had not seen the motion for a new trial that appellate counsel prepared and that they did not discuss the issues raised in the motion. The Petitioner said that they did not discuss the appellate brief filed by counsel and that counsel did not provide him with a copy.

The Petitioner testified that he attempted to speak with appellate counsel by telephone many times but that counsel's administrative assistant always said counsel was out of the office. The Petitioner said he sent counsel five to seven letters but never received a response. He said counsel charged $10,000 to appeal his convictions and to file an application for permission to appeal in the supreme court. He said counsel failed to file a timely application for permission to appeal.

On cross-examination, the Petitioner testified that trial counsel believed the State had strong evidence against him. He agreed that counsel presented the nurse and the neighbor as defense witnesses but said that counsel did not present his former wife. The Petitioner agreed the evidence showed that his former wife was not present when the offenses occurred and that the incidents occurred during a long period of time. He said that he did not know the teacher's name who could have testified that A.M. lied about the allegations, that he told counsel to "pull the recordings," that counsel did not obtain them, and that the Petitioner had not identified the teacher.

Appellate counsel testified that initially he worked for the public defender's office but that he moved to private practice about three years before taking the Petitioner's case. He said most of his work was criminal defense, although he did not have much appellate experience at this time. Counsel said that he consulted an assistant public defender, who "guided" counsel through the appellate process.

Appellate counsel testified that he represented the Petitioner at the motion for new trial hearing. Counsel said that although trial counsel also filed a motion for a new trial, he filed his motion, that both motions raised the same issues, and that one motion was "struck" from the record. Counsel said that he spoke with trial counsel about the case and the trial, that he probably reviewed the trial court file, and that he reviewed the transcripts. He identified the appellate brief and the motion for a new trial he filed. He said that before deciding which issues to raise on appeal, he and the Petitioner met at the prison to discuss which issues were most likely to garner relief. Counsel said that because the severance issue from the motion for a new trial was not raised on appeal, he must have concluded that it was not important and was unlikely to warrant relief. He said that he could not recall if he provided the Petitioner with a copy of this court's opinion in the previous appeal but that if he did not provide a copy, it was because possession of documents related to sexual offenses posed a safety threat to the Petitioner.

Appellate counsel testified that he did not cite to the record in the brief and that this court noted the lack of citations in its opinion. He agreed his argument for sufficiency of the evidence was short and did not include citations to legal authority. He agreed that his application for permission to appeal was untimely and that the supreme court denied his motion to consider the untimely application and dismissed the application.

Appellate counsel testified that after he and the Petitioner met at the prison, the Petitioner wrote one or two letters to which counsel responded and that they talked by telephone a couple of times. Counsel said that the Petitioner sent a "barrage of letters," in which the Petitioner accused him of taking the Petitioner's money when counsel was "in cahoots" with the prosecutor. Counsel did not respond to those letters. Counsel said that he

-10-

likewise stopped taking the Petitioner's calls because the Petitioner only wanted "to fuss" at him. Counsel said that the Petitioner filed a complaint with the Board of Professional Responsibility, which directed counsel to respond to the Petitioner's letters. Counsel said he responded, although the Petitioner's letters became increasingly hostile. Counsel denied that he did not communicate any information to the Petitioner. Counsel said that he provided the Petitioner with the appellate brief but that he did not recall specifically sending a copy to the Petitioner.

The post-conviction court denied relief. The court credited trial counsel's testimony and found that counsel met with the Petitioner many times before the trial, that counsel wrote him letters, and that they communicated effectively based upon counsel's ability to speak Spanish. The court found that counsel and the Petitioner discussed the nature of the charges, the discovery materials, and trial strategy. The court determined that counsel conveyed plea offers to the Petitioner, which he rejected, and investigated the case adequately.

The post-conviction court found that although the Petitioner alleged that trial counsel provided ineffective assistance by failing to call various witnesses and by failing to obtain DCS records, the Petitioner failed to present these witnesses and records at the post-conviction hearing. The court determined, as a result, that the Petitioner had failed to show deficient performance and prejudice.

The post-conviction court determined that appellate counsel was retained to represent the Petitioner, that counsel and the Petitioner met at the prison where the Petitioner was confined at the time, and that counsel raised two issues on appeal, after consulting with another attorney with more appellate experience. The court found that counsel did not cite to the trial court record in his appellate brief and that the application for permission to appeal to the supreme court was untimely. The court determined that counsel provided deficient performance by failing to cite to the trial transcripts and by failing to file a timely application for permission to appeal to the supreme court. The court, though, determined that the Petitioner failed to establish prejudice by clear and convincing evidence. This appeal followed.

The Petitioner contends that he received the ineffective assistance of appellate counsel. The Petitioner argues that counsel failed to cite to the trial court record and legal authority in the brief relative to sufficiency of the evidence, failed to raise on appeal all of the allegations in the motion for a new trial, and filed an untimely application for permission to appeal to the supreme court. The State responds that the post-conviction court did not err by denying relief.

Post-conviction relief is available "when the conviction or sentence is void or voidable because of the abridgement of any right guaranteed by the Constitution of

Tennessee or the Constitution of the United States." T.C.A. § 40-30-103 (2012). A petitioner has the burden of proving his factual allegations by clear and convincing evidence. *Id.* § 40-30-110(f) (2012). A post-conviction court's findings of fact are binding on appeal, and this court must defer to them "unless the evidence in the record preponderates against those findings." *Henley v. State*, 960 S.W.2d 572, 578 (Tenn. 1997); *see Fields v. State*, 40 S.W.3d 450, 456-57 (Tenn. 2001). A post-conviction court's application of law to its factual findings is subject to a de novo standard of review without a presumption of correctness. *Fields*, 40 S.W.3d at 457-58.

To establish a post-conviction claim of the ineffective assistance of counsel in violation of the Sixth Amendment, a petitioner has the burden of proving that (1) counsel's performance was deficient and (2) the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see Lockhart v. Fretwell*, 506 U.S. 364, 368-72 (1993); *Hill v. Lockhart*, 474 U.S. 52 (1985). The Tennessee Supreme Court has applied the *Strickland* standard to an accused's right to counsel under article I, section 9 of the Tennessee Constitution. *See State v. Melson*, 772 S.W.2d 417, 419 n.2 (Tenn. 1989).

A petitioner must satisfy both prongs of the *Strickland* test in order to prevail in an ineffective assistance of counsel claim. *Henley*, 960 S.W.2d at 580. "[F]ailure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim." *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996). To establish the deficient performance prong, a petitioner must show that "the advice given, or the services rendered . . . , are [not] within the range of competence demanded of attorneys in criminal cases." *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975); *see Strickland*, 466 U.S. at 690. The post-conviction court must determine if these acts or omissions, viewed in light of all of the circumstances, fell "outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. A petitioner "is not entitled to the benefit of hindsight, may not second-guess a reasonably based trial strategy by his counsel, and cannot criticize a sound, but unsuccessful, tactical decision." *Adkins v. State*, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994); *see Pylant v. State*, 263 S.W.3d 854, 874 (Tenn. 2008). This deference, however, only applies "if the choices are informed . . . based upon adequate preparation." *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992). To establish the prejudice prong, a petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

The record reflects that this court's opinion affirming the Petitioner's convictions and sentences was filed on May 12, 2015. On August 21, 2015, appellate counsel filed a motion requesting that the supreme court accept a late-filed application for permission to appeal, along with the proposed application. However, on March 23, 2016, our supreme court

entered an order stating that the application for permission to appeal was untimely and that the motion to accept the late-filed application was denied. The court dismissed the application after declining to waive the time limit in the interest of justice. *See State v. Ugenio Ruby-Ruiz*, No. M2013-01999-SC-R11-CD (Tenn. Mar. 23, 2016) (order); *see also* T.R.A.P. 11.

The State contends that because an application for permission to appeal was filed, albeit untimely, the Petitioner was not denied his right to seek review by our supreme court. The State asserts that the Petitioner cannot establish prejudice because the supreme court examined the issues raised in the application, along with factors considered by this court in determining whether to waive the timely filing of a notice of appeal, in denying the motion to accept the late-filed application. *See State v. Rockwell*, 280 S.W.3d 212, 214 (Tenn. Crim. App. 2007); T.R.A.P. 4(a). The State, likewise, asserts that because the Petitioner failed to show at the post-conviction hearing that the supreme court would have granted his application if it had been timely, he failed to establish prejudice.

Post-conviction relief in the form of a delayed appeal is appropriate when a petitioner has been "denied the right to appeal from the original conviction." T.C.A. § 40-30-113(a) (2018); *see State v. Evans*, 108 S.W.3d 231, 235-36 (Tenn. 2003); *see also* Tenn. Sup. Ct. R. 28, § 9(D)(1)(b). Tennessee Supreme Court Rule 28, section 9(D) permits a post-conviction court and this court to grant post-conviction relief in the form of a delayed appeal when a "petitioner, through no fault of his [or her] own, was denied second-tier review following [a] direct appeal." *Stokes v. State*, 146 S.W.3d 56, 59 (Tenn. 2004); *see Pinkston v. State*, 668 S.W.2d 676 (Tenn. Crim. App. 1984).

In *Evans*, trial counsel for the petitioner failed to file an application for permission to appeal from this court's denial of relief, and the petitioner sought post-conviction relief on the basis of ineffective assistance of counsel. 108 S.W.3d at 234-35. As a result of counsel's ineffectiveness, the petitioner was "unilaterally deprived . . . of the right to seek second-tier review" and was granted a delayed appeal for the limited purpose of seeking review by our supreme court. *Id*.

Likewise, in *Proctor v. State*, 868 S.W.2d 669 (Tenn. Crim. App. 1992), trial counsel did not file an application for permission to appeal to the supreme court and did not file a petition for rehearing in this court. The post-conviction court determined that "no grounds" supported a petition to rehear or review by the supreme court, that a delayed application for permission to appeal to the supreme court would have been the appropriate relief, but that "no grounds for relief exist[ed]." *Id*. at 672. As a result, the post-conviction court did not grant the petitioner a delayed appeal. This court, though, determined that counsel "unilaterally terminated the direct appeal following first tier review" and that the petitioner

was entitled to a delayed appeal for the purpose of seeking review from the supreme court. *Id*. at 673.

Appellate counsel did not file a timely application for permission to appeal, and the untimeliness of the application was through no fault of the Petitioner. The record supports the post-conviction court's determination that appellate counsel provided deficient performance by failing to file a timely application for permission to appeal. Relative to prejudice, we disagree with the State that the supreme court examined the issues raised in the application in denying the motion to accept the late-filed application. The supreme court's order simply states that the application was untimely, that the court denied the motion to accept the proposed late-filed application, and that the court would not waive the timely filing in the interest of justice. The order does not state that the court considered the merits of the allegations or engaged in any type of substantive review. This court will not speculate what our supreme court considered in summarily dismissing the proposed application. We conclude that the order does not reflect the court engaged in any substantive review.

We, likewise, reject the argument that the Petitioner cannot establish prejudice because he failed to show the supreme court would have granted his application if it had been timely. In *Wallace v. State*, 121 S.W.3d 652 (Tenn. 2003), our supreme court rejected this reasoning in the context of counsel's failure to file a timely motion for a new trial and concluded that a petitioner is not "required to demonstrate actual prejudice from counsel's deficient performance." *Id*. at 658. Instead, our supreme court determined that counsel's failure to file a timely motion for a new trial or to file a motion to withdraw in order for the petitioner to proceed pro se resulted in the "abandonment of his client," resulting in "the failure to preserve and pursue the available post-trial remedies and the complete failure to subject the State to the adversarial process." *Id*. As a result, the court concluded that counsel's deficient performance was "presumptively prejudicial" and resulted in the granting of a delayed appeal. *Id*.; *see Peguero v. United States*, 526 U.S. 23, 28 (1999) ("[W]hen counsel fails to file a requested appeal, a defendant is entitled to [a new] appeal without showing that his appeal would likely have had merit[.]"). Therefore, we conclude that a petitioner is not required to show "actual prejudice" when counsel fails to file a timely application for permission to appeal in the supreme court. Therefore, the Petitioner is not required to show that the he would have prevailed had the application been timely.

In the present case, appellate counsel failed to file a timely application for permission to appeal to the supreme court, depriving the Petitioner of second-tier review. Although counsel sought to late-file the application, counsel's failure to comply with the Rules of Appellate Procedure resulted in the abandonment of the Petitioner, and the Petitioner was denied the opportunity for substantive review by the supreme court. As a result, we conclude that the Petitioner is entitled to a delayed appeal for the purpose of seeking supreme court review of the conviction proceedings.

Because the Petitioner is entitled to a delayed appeal, the Petitioner's remaining ineffective assistance of counsel allegations are held in abeyance pending the resolution of the delayed appeal. Tennessee Supreme Court Rule 28, section 9(D)(1)(b)(ii) states, "Upon determination . . . that the petitioner was deprived of the right to request an appeal pursuant to Rule 11, Tennessee Rules of Appellate Procedure, the trial court shall enter an order granting the delayed appeal, staying the post-conviction proceedings pending the final disposition of the delayed appeal[.]"

Based upon the foregoing and the record as a whole, the judgment of the post-conviction court is reversed and the case is remanded for the entry of an order granting the Petitioner a delayed appeal for the purpose of filing an application for permission to appeal pursuant to the Tennessee Rule of Appellate Procedure 11. The Petitioner's remaining ineffective assistance allegations are stayed in the post-conviction court until the resolution of the application for permission to appeal.

_____
ROBERT H. MONTGOMERY, JR., JUDGE